**SIGNED.**

Clerk: This Decision sets a hearing.

**Dated: June 18, 2010**



_____
**JAMES M. MARLAR**
**Chief Bankruptcy Judge**
_____

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | )   Chapter 11 |
| TRIFECTA INVESTMENT GROUP, LLC, | )   No. 4:08-bk-09808-JMM |
| | )   Adversary No. 4:08-ap-00670-JMM |
| _____ Debtor. _____ | ) |
| | ) |
| TRIFECTA INVESTMENT GROUP, LLC, | )   **MEMORANDUM DECISION** |
| | )   **(RE: LIABILITY ISSUES)** |
| Plaintiff, | ) |
| vs. | ) |
| GREGORY PAUL MILLER, et al., | ) |
| | ) |
| _____ Defendants. _____ | ) |

       A trial in this matter came on for hearing on April 29 and 30, 2010. Witnesses were examined and documentary evidence was submitted, including deposition transcripts. Prior thereto and thereafter, the parties briefed the legal issues, concluding with argument on May 25, 2010. The Court now rules, and sets forth its findings of fact and conclusions of law.

**PROCEDURE**

**A.  Adversary Proceeding**

The trial in this matter was bifurcated, by stipulation, into liability and damage phases. Previously, Plaintiff's case against Hallmark Business Consultants, Inc. ("Hallmark") was resolved by summary judgment in favor of Hallmark; Plaintiff's case against Fidelity National Title Agency, Inc. ("Fidelity") was dismissed by stipulation.

Defendant Gregory Paul Miller ("Miller") counterclaimed against Trifecta Investment Group, LLC ("Trifecta"), and Page Glase ("Glase") under his guarantee, but presented no separate affirmative evidence to support his counterclaims, relying on the evidence developed in Plaintiff's case-in-chief.  The Court presumes that, if a corporate liability exists, repayment would be governed by the Debtor's Chapter 11 plan.[1]

Miller cross-claimed against Hallmark and Fidelity, but presented no evidence against said parties.  Therefore, Miller's cross-claim against both those parties will be DISMISSED, with prejudice.

The case then proceeded to conclusion as between Trifecta and Glase, aka Pleasure Spas, against Miller and Pleasure Spas, Inc.

**B.  Administrative File**

A voluntary Chapter 11 proceeding was filed by Trifecta on August 1, 2008.  A plan of reorganization was confirmed on February 17, 2010 (DN 61).  As part of its plan, Trifecta

---

[1]     As an aside, the confirmed plan treats Miller as a creditor who receives no payment.  Miller neither objected to the plan nor filed a claim.  As Miller was listed as a "disputed" creditor in the Debtor's schedules (DN 34), Miller was therefore required to file a claim. FED. R. BANKR. P. 3003(c)(2); 11 U.S.C. § 1111(a).  Not having done so, Miller has no affirmative claim against the assets of Trifecta.  However, since Trifecta apparently has no assets other than this lawsuit, the point is probably moot.

2

disclosed that it intended to pursue this litigation, and that any proceeds recovered therefrom would be distributed among its creditors.

Since filing the Chapter 11 case, it appears from the Debtor's Monthly Operating Reports that it has not continued in business, but has essentially wound down operations and pursued this litigation.

## JURISDICTION

This Court has jurisdiction, as a core proceeding. 11 U.S.C. § 157(B)(2)(O). The core nature of this proceeding was acknowledged in the complaint and answer stage of the case.

## FINDINGS OF FACT

### A. Background

Gregory Paul Miller ("Miller") and his wife are 100% shareholders of a corporation known as Pleasure Spas, Inc. ("PSI"). The business had been operational for approximately 8-10 years prior to 2006 (Ex. 5, 6).

The company installed above-ground spas for spa retailers in the Tucson area, handling the electrical connections and related masonry work at customers' homes (Ex. 5,6). Miller was licensed, by the Arizona Registrar of Contractors, and held a Class B-5 license (Ex. 1, 2, 4, 7). A B-5 license satisfied state licensing requirements for the type of contractor's work undertaken by PSI.

Some time in March or April, 2006, Miller decided to sell the assets of the PSI business, including his customer accounts, vehicles, inventory, goodwill, trade name and equipment (Ex. 4). He entered into a contract with a business broker, Hallmark, to assist him in that purpose. Hallmark's principal is Robert E. Lenhard (Ex. 4).

Thereafter, Hallmark took steps to market the PSI assets for sale.

## B.  The Sale

Toward the end of 2006, Page Glase ("Glase") approached Hallmark about purchasing a business in Arizona.  Hallmark began negotiating a contract for the sale of the PSI assets (*see* Ex. 7, 8, 9).  Because Glase did not personally have a contractor's license of the type necessary to operate the spa business, he needed Miller to remain as the license's "qualifying party" until Glase could either obtain the necessary license himself, or find an employee with that license.  Without such a licensed contractor, PSI was unable to operate.

A contract for the purchase of PSI's assets was signed by Glase, Miller and PSI between December 2 and 5, 2006 (Ex. 1).  In its essence, Glase agreed to acquire certain business assets of PSI, including vehicles, equipment, customer accounts and records, goodwill and the trade name "Pleasure Spas."  In addition, PSI and Miller, individually, agreed not to compete with Glase in a business similar to Pleasure Spas for a ten-year period.  Another condition of the sale was that Miller[2] agreed to remain as the business' qualifying party "until Purchaser [Glase] is able to obtain his B-10 license issued by the State of Arizona Registrar of Contractors."  (Ex. 1, at 12, para. 9.3.)

As consideration for the purchase of the assets described above, Trifecta and Glase promised to pay PSI $350,000.  Glase personally guaranteed each note.  This money was to be paid in the following manner:

| | | |
|---|---|---|
| $125,000 | | Paid at closing (Ex. 10, 11). |
| $225,000 | A. | $50,000 promissory note to be paid on or before January 1, 2008 (Ex. 13).  This note bore 7% interest. |
| | B. | $175,000 promissory note, payable in monthly instalments of $3,445.11, beginning April 1, 2007. Any unpaid balance was fully due and payable on January 1, 2010 (Ex. 21, "A").  This note bore 7% interest. |

---

[2]    The Agreement for Purchase and Sale specifies "Seller," but PSI did not hold the B-5 license.  Only Miller, individually, did (*see* Ex. 7).

In order to secure the $225,000 deferred payment price, Glase, on behalf of Trifecta, executed a Chattel Security Agreement (Ex. "A").

In the days prior to closing, the parties struggled with an amendment to the sale contract, which dealt with the type of license required to do the work performed by PSI (*see* Ex. 14, 15, 16, 17, 18, 19, 20). The parties then executed a document entitled "Addendum to Agreement for Purchase and Sale" wherein Miller stated that the license he currently held, relating to the PSI business, was a B-5. He further noted that he had "inactivated" his B-10 license. However, he explained that the business did <u>not</u> need <u>both</u> a B-5 and a B-10 license, as only a B-5 was "acceptable to continue doing the kinds of work for customers that is presently provided. . . ." (Ex. 2.) Miller then agreed to remain as the qualifying party "for PSI while Glase obtains his Arizona contractor's license." The parties then signed the Addendum (Ex. 2).

The transaction closed smoothly on December 19, 2006 (Ex. "A"), and PSI delivered its Bill of Sale to Trifecta (Ex. 12).

## C. Operations After Closing

The sale closed on December 19, 2006 (Ex. "A"). Glase then began operating PSI, and testified that PSI worked on approximately 200 spa jobs, and that "2007 was an excellent business year." Miller performed as agreed in 2007, acting as PSI's qualifying party and did not engage in any direct or indirect competition with Trifecta or Glase. During 2007, the Arizona Registrar of Contractors had no complaints about the PSI operation.

In about November, 2007, Glase sensed that the next year, 2008, might present challenges due to an economic slowdown and the general state of the economy, and that "we'd go at a reduced rate, but we'd still have business." In 2007, the business generated total income of $355,879.85 (Ex. 23).

In 2007, Glase and Trifecta made all of the required monthly payments called for by the $175,000 promissory note (Ex. 21, 25). Those payments were collected by Fidelity, and were remitted to Miller in a timely manner.

5

1       At the end of 2007, a slump in the general business economy caused a slowdown in
2   the business of PSI.  At that time, Glase felt that he had to "put my management skills back
3   together," and he began making adjustments to the business, including laying off some of its
4   employees.

5       By March, 2008, Glase testified that the "business had cash flow problems due to
6   general economic conditions, but it was not severe."

7       However, by May, 2008, Glase began to suspect that it "didn't look like the economy
8   would turn around," but that, nonetheless, he "still saw a future for the business."  It was at that point
9   that Glase began contemplating a bankruptcy proceeding for the business.  This was due in part to
10  "slow pay" from some of his customers, such as Whitewater Pools, and similar developing cash flow
11  problems.

12      The $50,000 promissory note, fully due to PSI on January 1, 2008 (Ex. 13) was not
13  paid.  Also, the April, 2008, monthly payment, due on the $175,000 promissory note was not made
14  either (Ex. 25).  The last monthly payment on the instalment note was made on May 6, 2008
15  (Ex. 25), and applied to the missed April, 2008, payment.

16      Thus, by May 2, 2008, Trifecta was in default on its January 1, 2008, $50,000 payment
17  (plus 7% interest), and on its obligation to maintain regular agreed monthly payments on the
18  $175,000 note.  On the larger note, according to Fidelity's accountings, the entire balance then due
19  was $144,394.64 (Ex. 25).

20

21                          **D.  Miller Declares Default, Seizes Collateral**

22

23      By mid-July, 2008, things had reached the breaking point.  By then, Glase and Trifecta
24  were three months behind on the larger note's monthly payments, and had not paid the smaller
25  $50,000 note, which had been fully due since January.

26      On July 15 or 16, 2008, Glase advised Miller that he had spoken to an attorney and
27  intended to file for reorganization under Chapter 11.

28

Case 4:08-ap-00670-JMM    Doc 132    Filed 06/18/10    Entered 06/21/10 07:23:40    Desc
                Main Document        Page 6 of 23

1    Upon receiving that news, Miller took swift action. He exercised his right to self-help,

2 repossessing the collateral, and declared the sale contract breached.

3    At that juncture, Miller also began to take steps to directly compete with Trifecta,

4 hiring away some of its employees and asking its prior customers to give PSI and Miller its business.

5 In addition, Miller, either directly or indirectly, would not allow Trifecta to act under his B-5

6 contractor's license.

7    Glase testified that those actions dealt Trifecta "a double whammy," crippling its

8 ability to continue in active business.

9    On August 1, 2008, Trifecta filed for Chapter 11 reorganization.

10

11    **E.  Post-Filing Events**

12

13    After August 1, 2008, Miller took steps to complain to the Registrar of Contractors

14 that Trifecta was still attempting to operate using his license, because Miller believed that Trifecta's

15 breach eliminated his reciprocal agreement to act as its qualifying party (Ex. 31).  The Registrar

16 apparently agreed with Miller, as did the Pima County Attorney, which convicted Glase of

17 contracting without a license.

18    Events deteriorated further, and this litigation was filed, as part of the bankruptcy case,

19 on September 30, 2008.

20

21    **DISCUSSION**

22

23    This is a contract case, governed by principles of Arizona law.  No bankruptcy issues

24 are involved.

25

26

27

28

7

## A. Modification of $50,000 Note

It is clear that Trifecta and Glase breached the contract first (Ex. 1, 2), by failing to pay the two promissory notes according to their terms. Prior to that breach, neither Miller nor PSI had breached the contract in any way.

The $50,000 note was due on January 1, 2008. It was never paid, in whole or in part. Glase testified that it was his understanding that he was excused from performing by an unwritten agreement with Miller that there was to be an offset for separate wall and masonry work that Glase had referred to Miller. Miller disputes this contention.

The only writing presented by Glase is a memo from his own business files, created on or about May 21, 2007, by his bookkeeper, which states:

> Greg is doing masonry work and taking off of the $50,000 balloon payment. Greg and Page are tracking these themselves and will give us in writing at year end the amount to adjust.

(Ex. 24.) No other writings or accountings were presented to the Court, as evidence of this alleged modification to the promissory note (Ex. 13). Miller did not sign Ex. 24, nor is there anything else signed by Miller to show that he agreed to any alteration of the express terms of the $50,000 promissory note (Ex. 13).

The note itself, signed by Page Glase, individually and for Trifecta, states:

> This Note may not be changed orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

(Ex. 13.) Obviously, the only party which would benefit by any undocumented claimed modification or offset is Trifecta and/or Glase. The parties adversely affected by, and "against whom" any such modification, alteration or discharge would act were Miller and/or PSI. Thus, Miller and/or PSI would have to agree, in writing, to any alteration of the promissory note. This is not only basic Arizona law, but a condition of the note itself. The Statute of Frauds, ARIZ. REV. STAT. § 44-101(9), is intended to require a writing from the person who is to be affected by a change

Case 4:08-ap-00670-JMM    Doc 132    Filed 06/18/10    Entered 06/21/10 07:23:40    Desc
Main Document    Page 8 of 23

to an unequivocal promise to pay. Such a change cannot be made by the uncorroborated unilateral testimony of the person who is required to pay on the note. Since the note's language required any modification to be in writing, the parties are bound to honor that agreement.

Consequently, Trifecta's claim that it had not breached the $50,000 note, on January 1, 2008, is rejected. Trifecta breached when it did not pay the $50,000 note on January 1, 2008 (Ex. 1, at 3, para. 2.2(c)). Up to that time, January 1, 2008, Miller and PSI performed under the purchase agreement (Ex. 1, 2) without adverse consequence to Trifecta.

Trifecta breached first.

## B. Default Under the $175,000 Note

Trifecta also admitted that it did not pay as agreed on the $175,000 note. It breached its agreement thereunder when it missed the May, June and July, 2008 monthly payments. It had no excuse for doing so, other than concerns over a general economic slowdown in the Greater Tucson market.

Importantly, Trifecta did not place any blame upon Miller or PSI for this turn of events in the general markets. Trifecta did not, for example, complain that, up to and through July 1, 2008, Miller had refused to perform as agreed, as the qualifying party, or that Miller had competed with Trifecta in any way. To that date, no evidence was presented that Miller or PSI had breached any part of their agreements. (Ex. 1, 2.)

Consequently, the Court finds and concludes that Trifecta and Glase breached the Agreement for Purchase and Sale (Ex. 1, 2), by failing to make the payments under the promissory notes in a timely manner (Ex. 1, p. 3, para. 2.2(d); Ex. 21).

The Court also finds and concludes that, to and through July 16, 2008, neither Miller nor PSI had breached the contract in any way.

9

**C.  Repossession**

Miller and PSI repossessed the collateral after Trifecta defaulted, and after Glase advised Miller that he would be seeking bankruptcy protection.  The Chattel Security Agreement specifically allowed that action, upon default in the payment obligations (Ex. "A," Chattel Security Agreement).  Default occurred, under the express terms of the Chattel Security Agreement by:

1. Trifecta's failure to pay, when due, the monetary obligations of the two notes (Ex. "A");

2. Upon the filing of bankruptcy on August 1, 2008 (Ex. "A"); and

3. Miller and PSI's "insecurity" upon not being paid on the obligation, and upon Trifecta's statement through Glase, on July 15 or 16, 2008, that it intended to file for bankruptcy relief.

These events of default are clearly spelled out in the Chattel Security Agreement (Ex. "A").

The Arizona Uniform Commercial Code, ARIZ. REV. STAT. § 47-9609(A) and (B), authorizes a secured party, after default, to "take possession of the collateral" without judicial process, if it can do so without breaching the peace. *Walker v. Walthall*, 121 Ariz. 121, 588 P.2d 863 (App. 1978).  Self-help repossession occurred here.  The repossession occurred before bankruptcy was filed on August 1, 2008.  There was no evidence that a breach of the peace occurred in the repossession.

The Court finds and concludes that the act of repossession, by Miller and/or PSI, was lawful.

**D.  Arbitration**

Trifecta urges the Court to find that Miller and PSI breached the contract by refusing to initiate arbitration, as required by paragraph 3.4 of the contract.  Pursuant to Arizona law, an

arbitration agreement "is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract." ARIZ. REV. STAT. § 12-1501.

Trifecta misinterprets the rationale behind such an arbitration clause. That clause requires that "any controversy . . . relating to or arising out of this agreement or the performance of any provisions thereof will be settled by arbitration." (Ex. 1 at 5, para. 3.4.) But here, there was no controversy over the interpretation of the Agreement for Purchase and Sale, or the two notes, or the Chattel Security Agreement. *See Craviolini v. Scholer & Fuller Associated Architects*, 89 Ariz. 24, 27, 357 P.2d 611, 613 (1961) ("Where there is no dispute there is no arbitration, and no arbitrator.") All was progressing smoothly until Trifecta unilaterally failed to pay the two promissory notes. Once Trifecta breached, there was nothing to arbitrate. There was no "controversy" over how to interpret the contract, nor any disagreement as to what the parties' respective rights were. Trifecta simply refused to perform. Therefore, there was nothing to arbitrate. After Trifecta's unequivocal breach, Miller was free to exercise his lawful legal remedies, which he did by repossessing the collateral. Thereafter, Miller simply defended the lawsuit brought by Trifecta, and counterclaimed.

Neither the Complaint nor the Amended Complaint filed by Trifecta (DN 1, 28), alleged that failure to arbitrate was an actionable breach of contract. The Joint Pretrial Statement, at 7, no. 32, and at 20, nos. 9 and 10, refers to "Miller's actions in failing to arbitrate" as a breach of contract and a breach of the duty of good faith and fair dealing (DN 120).

It was Trifecta, however, who waived or repudiated the arbitration provisions by seeking redress of damages in court, rather than seeking to compel arbitration. *See Meineke v. Twin City Fire Ins. Co.,* 181 Ariz. 576, 582, 892 P.2d 1365, 1371 (1994) ("[A] party's filing of a lawsuit without invoking arbitration . . . would nearly always indicate a clear repudiation of the right to arbitrate . . . ")*; Bolo Corp. v. Homes & Son Constr. Co.*, 105 Ariz. 343, 347, 464 P.2d 788, 792 (1970) (by seeking redress through the court system, party acquiesced in rejection of arbitration clause and waived right to compel arbitration); *Cooper v. QC Fin. Servs., Inc.,* 503 F. Supp. 2d 1266, 1274 (D. Ariz. 2007) (a party to a contract may waive its right to enforce an arbitration agreement by its conduct)*; City of Cottonwood v. James L. Fann Contracting, Inc.,* 179 Ariz. 185, 190-91, 877 P.2d 284, 289-90 (1994) ("[P]roof of waiver requires showing conduct inconsistent with

11

the arbitration remedy . . . . Inconsistency usually is found when one party engages in conduct preventing arbitration, proceeds at all times in disregard of arbitration, expressly agrees to waive arbitration, or unreasonably delays requesting arbitration."); *U.S. Insulation, Inc. v. Hilro Constr. Co.*, 146 Ariz. 250, 254, 705 P.2d 490, 494 (Ct. App. 1985) (same). Trifecta's delayed claim is also evidence of a repudiation of the arbitration clause. One court has held:

> Untimeliness may constitute repudiation of the arbitration agreement if the repudiating party has acted so inconsistently with the arbitration agreement as to waive its right to proceed under the agreement. Repudiation is a voluntary relinquishment of a known right that usually entails prejudice to the other party. Because repudiation calls into question the existence of the arbitration agreement, repudiation is an issue for the court.

*City of Cottonwood*, 179 Ariz. at 190, 877 P.2d at 289.

Here, either party had the right to seek arbitration. Trifecta did not. Furthermore, in the Amended Complaint, Trifecta did not allege a claim for breach of the implied covenant of good faith and fair dealing by Miller based on his alleged breach of the arbitration clause, but rather, on alleged conversion of property because Miller repossessed in lieu of seeking arbitration. *See DN 28 at 5 ¶ 24.* We have determined, herein, that Miller's actions were valid and proper.

The Court finds and concludes that, when Trifecta refused to pay the notes, Miller was under no legal obligation to seek arbitration. He neither breached the contract nor breached a duty of good faith and fair dealing. And, thereafter, Trifecta waived its rights to demand arbitration when it filed this lawsuit.


## E. Covenant Not to Compete


No evidence was presented that, prior to July 15 or 16, Miller and/or PSI had competed in any way, directly or indirectly, with Trifecta. Competition against Trifecta only began after Trifecta breached its agreement to pay for the purchased business, and threatened bankruptcy.

Case 4:08-ap-00670-JMM   Doc 132   Filed 06/18/10   Entered 06/21/10 07:23:40   Desc
Main Document    Page 12 of 23

Trifecta argues that the Covenant Not to Compete was a separate agreement from the purchase obligation. However, the evidence clearly shows that such covenant was only one component of a fully integrated agreement. This is because:

1. There is nothing in Exhibit 1 which separates the Covenant Not to Compete from all the other contractual covenants.

2. Paragraph 6.0 states "This Agreement contains the entire agreement of the parties . . . ." It does not refer to multiple agreements.

3. No credible evidence was presented as to what consideration was given for the non-compete provision, if it was truly intended to be a stand-alone provision.

4. The "total purchase price" of $350,000 included the Covenant Not to Compete, along with the other assets sold (Ex. 1 at 3, para. 2.3).

Thus, the intent of the parties, discerned from reading the relevant sale documents, was to treat the Covenant Not to Compete as part of the entire agreement, and not to treat it as a separate contract. *See Waddell v. White*, 51 Ariz. 526, 540, 78 P.2d 490, 496 (1938) ("Primarily, the question of whether a contract is entire or severable is one of intention. . . .")

Therefore, when Trifecta breached the payment terms, and breached first, Miller and PSI were no longer restricted by the non-compete clause.

Looking at it another way, had Trifecta fully performed all of its payment considerations, Miller and PSI would have been bound for the ten-year period specified by the non-compete provision. Sadly, that did not occur.

13

## F. Qualifying Party

Trifecta contends that, even though it breached its agreements to perform monetarily, Miller was still obligated to act as the qualifying party for Trifecta, which would thereby allow Trifecta to continue to do business under Miller's B-5 contractor's license.

For the reasons set forth above, once Trifecta breached, then Miller, as the non-breaching party, was no longer contractually bound to honor only _his_ agreements. The consideration for his willingness to act as qualifying party, and to lend his contractor's license to Trifecta, was that Trifecta would, in turn, honor its agreement to fully pay for the purchased business.

Trifecta also contends that Miller is at fault by not being an owner, part owner or employee of Trifecta during the time that Trifecta was using his license to do business. It relies on ARIZ. REV. STAT. § 32-1127.

This argument fails for several reasons. First, there was no evidence presented that Trifecta was injured by that fact. Glase himself testified that 2007 was an excellent year, and that the business declined in 2008 due to a general downturn in the economy. There was no testimony that the business suffered due to Miller's alleged violation of an Arizona statute. Thus, even if, _arguendo_, Trifecta was correct that its use of Miller's license was contrary to Arizona law, Trifecta suffered no damages because of it. Nor was it proven that Trifecta's ability to do business was impaired by Miller not being an employee or part owner.

Second, Trifecta is estopped from contending that Miller's alleged violation of an Arizona statute now gives it a cause of action against Miller. This is because Trifecta benefitted from the use of Miller's license, and earned substantial revenue using it. No fines, penalties nor cease and desist orders were assessed against Trifecta from December 19, 2006 to July 16, 2008. This is the period that Trifecta operated until its assets were repossessed, and the contract terminated for Trifecta's non-payment. The State Registrar of Contractors never contended that a violation of state law occurred during that period, nor took any steps to shut the business down while Miller acted as the qualifying party.

1      Third, Trifecta had it within its power, for the year and seven months prior to closing, to perform sufficient due diligence to ascertain what laws impacted its use of Miller's B-5 license. Miller agreed to remain as the qualifying party for PSI while Glase was obtaining his own contractor's license (Ex. 1, para. 9.3; Ex. 2). Had Trifecta felt uneasy about this arrangement, it could have consulted Arizona law, the Registrar of Contractors or an attorney.

      Fourth, if any alleged violation of Arizona law, by Miller, had occurred during the time when Glase was operating the business, <u>and</u> if such violation had injured Trifecta in any material way, or had caused Trifecta to suffer economic loss, then perhaps a ground for rescission might be argued. But none of those things happened.

      Fifth, Glase and Trifecta acknowledged that they had relied on their "own inspection of Business . . . with regards to . . . all other material facts of Seller in making this agreement" (Ex. 1, at 11, para. 8.1). Clearly, license issues concerned Glase/ Trifecta prior to closing (*see* Ex. 2, 7, 8, 9, 14, 15, 16, 19, 20). Apparently, though, Glase/ Trifecta were satisfied that the business could operate under Miller's license. And, most importantly, it did operate without detriment until <u>it</u> defaulted. No action, inaction, representation or misrepresentation of Miller, as to the license issues, caused any loss, damage or detriment to Trifecta.

      Sixth, the statute upon which Glase/Trifecta now relies in order to justify its breach, ARIZ. REV. STAT. § 32-1127, was enacted in 1975. The statute's last amendment was in 1986. Glase/Trifecta was advised, and signed, page 14 of Ex. 1, which carried the admonition that the Agreement for Purchase and Sale was a "legally binding document," and that an attorney should be consulted for legal advice. Trifecta elected not to check into what it now contends was a vital element of the contract.

      Seventh, even if Miller, *arguendo*, was in violation of ARIZ. REV. STAT. § 32-1127, the penalty would be revocation or suspension of the license, or appropriate action by the Attorney General under the consumer fraud statutes. ARIZ. REV. STAT. § 32-1151, *et seq*. Remedies under those statutes include injunctive relief and civil penalties of up to $10,000 per violation. ARIZ. REV. STAT. §§ 44-1528; 1531. Or customers might have refused to pay a non-licensed contractor. No evidence was presented that any of those types of things happened.

Trifecta did not allege, or prove, that it had been subjected to any penalties or processes, by any state agency, up to July 16, 2008. From the evidence, it appears that the only complaint against it was made August 14, 2008, on Miller's complaint, about a month after its defaults had caused the repossession and contract termination to occur (Ex. 31). By then it was too late, as Trifecta's breach caused escalating problems.

Eighth, Trifecta did not allege that it took any steps to remedy the "employee" status for Miller, due to any discovery of ARIZ. REV. STAT. § 32-1127. This is because Trifecta had suffered no injury or complaint due to Miller's employment status. Trifecta presented no evidence that Miller's employment status, under the Arizona statute, was ever an issue prior to July 16, 2008. Trifecta thus waived any legal claim on that theory.

The Court finds and concludes that no default under the qualifying provisions occurred, which would have been sufficient to give Trifecta a reason to breach the payment provisions of the contract.

## G. Rescission

The Agreement for Purchase and Sale, and its Addendum (Ex. 1,2) constituted a single, integrated contract made up of numerous but inter-related components. In return for a payment of $350,000, Miller and PSI agreed to transfer all of the assets of PSI, including its customer accounts, trade name, certain equipment and inventory, and intangible goodwill, to Trifecta. In addition, so long as Trifecta complied with its part of the bargain, to pay for the business purchased, according to the contract (Ex. 1 at 2, 3, para. 2.0) and the promissory notes called for therein (Ex. 13, 21), then Miller, individually, and PSI agreed not to compete for a ten-year period, and to allow Trifecta to operate using Miller's B-5 license, until such time as Glase could qualify for a contractor's license in his own right.

Had Trifecta not fallen into default, Miller and PSI would have had continuing duties to honor. But when Trifecta breached, those ongoing contractual responsibilities ended.

1       Trifecta contends that it is entitled to rescind the contract due to a "mutual mistake"

2   over Miller's license status, the belief that a B-10 contractor's license (in addition to a B-5 license)

3   was necessary to operate the business, and over the fact that Miller should have complied with ARIZ.

4   REV. STAT. § 32-1127 in some manner.

5       As for the license status, the Court finds and concludes that there was no mistake,

6   mutual or otherwise.  The parties' agreement Addendum (Ex. 2) specifically noted that (1) Miller's

7   B-10 license was inactive; (2) the active B-5 license was all that was necessary to legally operate

8   the business; and (3) Miller would continue to allow the business to operate under his license until

9   Glase could obtain a license in his own right.  (Ex. 1, para. 9.3; Ex. 2.)  And, the business had no

10  difficulty operating during the period when Trifecta complied with its obligations.

11      Thus, had Trifecta not breached its promise to pay for the business, Miller would have

12  been required to remain as its qualifying party.

13      Trifecta argues that, because Miller did not remain an employee or part-owner of the

14  business, this statutory requirement gives it grounds to rescind, until Glase could find another way

15  to obtain either a license or a new qualifying party.  This argument fails for a number of reasons.

16      First, Trifecta did not demonstrate any prejudice due to such violation.  The State did

17  not sanction, enjoin or penalize the business in any way.  There was no showing of harm or

18  detriment due to this violation.

19      Second, the Plaintiff did not show that this fact was material to the contract.  Miller

20  and PSI did all that they were required to do under the contract.  Remaining an employee was not

21  a material provision of the contract they had agreed to.  Being able to use the B-5 license was a

22  condition of the contract.  And, that license was so used, and Trifecta made money using it.  Trifecta

23  suffered no damage.

24      Third, Trifecta did not show that it made any effort to comply with the statute, such

25  as by employing Miller, even if for only a nominal sum each year.  It would appear that the statute

26  could easily have been complied with by adding Miller to the payroll, even if for $1.00 per year.

27  It is apparent from the record that Miller otherwise complied with the statute, as he was "actively

28

engaged in the classification of work for which such responsible managing employee qualifies in behalf of the license."

Fourth, it was not shown that Trifecta was misled in any way. It had ample opportunity to perform due diligence as to what the Arizona Registrar of Contractors required, but was satisfied with what the contract stated. For its part, neither PSI nor Miller represented anything that was not true. And, Trifecta and Glase acknowledged that they had had adequate opportunity to investigate all "other material facts." (Ex. 1, at 11, para. 8.1.) Moreover, Miller did not misrepresent any material fact. He merely stated that he held a B-5 license and would remain as qualifying party until Glase was able to qualify, himself, as the licensed individual.

The law, concerning rescission for "mutual mistake," is established in Arizona. In Arizona a contract may be rescinded when there is a mutual mistake of material fact which constitutes "an essential part and condition of the contract." *Renner v. Kehl,* 150 Ariz. 94, 97, 722 P.2d 262, 265 (1985). For example, in *Renner*, the sole purpose of the contract was to enable respondents to grow jojoba, which depends upon an adequate water supply. All parties were of the opinion that there would be sufficient water. After the respondents spent $229,000 developing the land, it was determined that the aquifer underlying the property was inadequate for commercial production of jojoba. 150 Ariz. at 96. The contract was rescinded because, as the court found, "[t]he belief of the parties that adequate water supplies existed beneath the property was 'a basic assumption on which both parties made the contract.'" Id. at 97 (citing RESTATEMENT (SECOND) OF CONTRACTS § 152)).

Based on the foregoing analysis, the court concludes that the alleged mistakes were not material facts essential to the contract. Even if these facts constituted mutual mistake, the contract was not voidable because the license issues <u>never</u> rose to a level of causing any material interference with Trifecta's ability to do business.

The RESTATEMENT further provides that, in the event of mutual mistake, "the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154." Id. § 152(1). Section 154 states:

A party bears the risk of a mistake when:

18

1    (a)    the risk is allocated to him by agreement of the parties, or

2    (b)    he is aware, at the time the contract is made, that he has only limited

3            knowledge with respect to the facts to which the mistake relates but

4            treats his limited knowledge as sufficient, or

5    (c)    the risk is allocated to him by the court on the ground that it is

6            reasonable in the circumstances to do so.

7

8        The evidence and circumstances show that both parties were aware of the type of

9    business being sold and license requirements, in general.  From the terms of the initial contract as

10   well as the Addendum, the parties believed that the license held by Miller was sufficient to operate

11   the business.  Glase testified that he had virgin, or limited knowledge about operating a spa business.

12   Thus, the RESTATEMENT places the risk of mistake on him.  § 154(b).  Furthermore, unlike the total

13   failure of the jojoba development in *Renner,* due to mutual mistake, here the spa business flourished,

14   and Plaintiff was not adversely affected by the alleged mutual mistakes.

15

16                    **QUESTIONS RAISED IN JOINT PRETRIAL STATEMENT**

17

18        In their Joint Pretrial Statement (DN 120), the parties have asked the court for specific

19   rulings on the legal issues.  Here, the Court will do so.

20

21                                **A.  Plaintiff's Questions**

22

23   1.    Is the Purchase Contract an independent contract from the              No
           promissory notes, setting forth separate duties and obligations?

24

25   2.    Did the breach of the promissory notes amount to a breach of           Yes
           the Purchase Contract?

26

27   3.    Could Defendant lawfully serve as Debtor's qualifying party            Yes
           for purposes of operating Pleasure Spas, even though Miller
28         was not an employee, officer, or owner of Trifecta?

19

| | |
|---|---|
| 4.   Could Pleasure Spas lawfully perform pool electric under a B-10 Contractor's License? | Yes, but no qualifying party held such an active license at any relevant time. Nor was a B-10 license the sole license of work that Pleasure Spas performed. A B-5 license allowed it to do the same work. |
| 5.   If Defendant could not lawfully act as the qualifying party for Debtor and/or if Pleasure Spas could not lawfully perform pool electric under a B-10 Contractor's License, did parties' mutual mistake in this regard entitle Debtor to rescission of the Purchase Contract? | There was no mutual mistake. |
| 6.   If Defendant could not lawfully act as the qualifying party for Debtor, did the Purchase Contract's qualifying party provision result in a failure of consideration, result in a material misrepresentation, or otherwise require rescission of the Purchase Contract? | There was no failure of consideration, and there was no material misrepresentation. Therefore, rescission is not a remedy. |
| 7.   Did Defendant abide by UCC law in Defendant's seizure[3] of the business assets? | Yes. The repossession was legal. |
| 8.   Was Defendant's competitive operation of Pleasure Spas, following seizure of the business assets, a breach of the Purchase Contract's covenant not to compete under Section 3.2? | No, because by then, the contract had been terminated by Plaintiff's breaches. |
| 9.   Was Defendant's refusal to act as the Debtor's qualifying party following seizure of the business assets a breach of the Purchase contract's qualifying party requirements under Section 9.3? | No, because by then, the contract had been terminated by Plaintiff's breaches. |
| 10.   Was Defendant's failure to arbitrate following Plaintiff's non-payments a breach of the Purchase Contract under Section 3.4? | No |

---

[3]     The question also referred to the "later handling" and disposition of the assets. But that point relates to the bifurcated damages aspect of the case.

| | | |
|---|---|---|
| 11. | Did any of Defendant's acts amount to a breach of the covenant of good faith and fair dealing? | No |
| 12. | Did Defendant convert the business clients of Plaintiff in such as manner as to tortiously interfere with Plaintiff's business contacts? | No |
| 13. | Is Plaintiff entitled to punitive damages as expressly set forth by the Purchase Contract's covenant not to compete and required by Defendant's behavior? | No |
| 14. | Is Plaintiff entitled to an award of costs and reasonable attorney's fees incurred herein pursuant to the Purchase Contract and/or ARIZ. REV. STAT. § 12-341.01? | No |

## B. Defendant's Questions

| | | |
|---|---|---|
| 1. | Is Defendant entitled to the balance due on any of the promissory notes or other obligations of the Plaintiff to Defendant pursuant to the parties' agreements? | Yes. However, as to Trifecta, that remedy may be barred by the plan. As to Glase, he personally guaranteed the obligations. |
| 2. | Were the acts of the Defendant subsequent to the Plaintiff's breach privileged? | Yes |
| 3. | Were the Plaintiff's actions with respect to his refusal to pay on his obligation to Defendant a failure of consideration? | No. They were a breach of an executed agreement. |
| 4. | Does Defendant have offsets as against any claims of Plaintiff, and if so, in what amount? | Bifurcated to damages phase. |
| 5. | Does the Plaintiff have unclean hands, or is he equitably and judicially estopped to assert the validity of the complaint herein, and has he waived his right to proceed herein? | Yes, estoppel and waiver on certain issues. |
| 6. | Did Plaintiff's breach excuse further performance by Defendant? | Yes |

21

7. Is Defendant entitled to an award of his reasonable attorney's fees incurred herein pursuant to ARIZ. REV. STAT. § 12-341.01?      Yes

8. Is Plaintiff allowed to introduce parol evidence to vary the terms of the parties' written agreements?      No

## CONCLUSION

Based upon the foregoing, the court is prepared to enter judgment in favor of the Defendant Miller herein. Plaintiff's Complaint against him shall be dismissed, with prejudice.

This ruling does away with the need to continue to a damages phase as to Plaintiff's claims. However, as to Miller's counterclaims, the evidence proved a breach by Plaintiff on the two promissory notes. If a damages phase is needed, the court will set such a hearing so that Miller may prove up his deficiency claim against the guarantor, and the guarantor, Glase, may raise defenses thereto. It is settled, then, that the following damages have been and are now liquidated in the first phase, as follows:

1. Promissory Note for $50,000. Judgment for counter-claimants for $50,000 principal, plus simple interest, non-compounding, from January 1, 2007, until paid, at the rate of 7% per annum (Ex. 13).

2. Promissory Note for $1750,000. Judgment for counter-claimants for $144,394.64, principal, plus simple interest, non-compounding, from May 1, 2008, until paid, at the rate of 7% per annum (Ex. 1, 21, 25).

However, legal and factual questions still exist as to whether Defendant properly complied with the disposition provisions of the UCC, specifically ARIZ. REV. STAT. § 47-9610, *et seq.*, and what offsets due to those sections of the UCC may be applied in Plaintiff's favor, against the foregoing indebtedness.

22

1         Accordingly, the Court and counsel should meet and confer, in a status hearing, to

2   determine how to proceed in order that a final judgment may eventually be entered.

3         The questions relating to attorney's fees and costs must also be decided, so the parties

4   should be prepared to discuss those issues as well.

5         A status hearing is set for **July 13, 2010 at 1:30 p.m.,** Courtroom 329, U.S.

6   Bankruptcy Court, 38 South Scott Avenue, Tucson, Arizona.

7

8         DATED AND SIGNED ABOVE.

9

10  COPIES to be sent by the Bankruptcy Notification
    Center ("BNC") to all parties to this adversary proceeding

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28